IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 81109-6-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ANNA VALERIYA KASPAROVA, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| ABEL LINARES-MONTEJO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

ANDRUS, A.C.J. — Anna Kasparova appeals her conviction for first degree murder after a jury found that she and her codefendant, Abel Linares-Montejo,[1] fatally shot Edixon Velasquez while attempting to rob him. She raises seven challenges to her conviction and sentence. We reject each and affirm.

FACTS

Anna Kasparova and Edixon Velasquez met in early 2017 and began a brief, sporadic romantic relationship. The relationship eventually ended and Kasparova began dating Linares later that year.

---

[1] Because the parties referred to Linares-Montejo as "Linares" at trial, we do the same here.

On September 17, 2017, Velasquez reached out to Kasparova via Instagram and mentioned that he had heard she had been fired from her barista job. Kasparova told him that she had quit and then asked if she could see him. Kasparova continued to make flirtatious advances, asking Velasquez if she could come over to his house, but he declined because he had to work early the following morning. The next day, Velasquez and Kasparova made plans to see each other on September 19.

While Kasparova was talking with Velazquez, she was also privately messaging the Facebook account of her friend, Habibti Maryooma. Kasparova asked about Velasquez[2] and then told Maryooma that she wanted to "catch him cause he be asking about me st [sic] work." Kasparova said she wanted to "get him." Maryooma responded it would be "so easy." Kasparova then said "I told him I wanna [f---] him (which I don't) obviously lol and have him boped lol." Maryooma and Kasparova agreed that Velasquez was an "easy target."

On September 19, Velasquez sent a message to Kasparova with his home address and Kasparova indicated she would arrive around 6 p.m. Shortly after 6 p.m. that evening, Velasquez sat down for dinner with his two roommates. Velasquez's roommates saw Kasparova's black Acura drive by the house.

Kasparova texted Velasquez, asking him to come outside because she could not find his house. Velasquez did not want to come outside because it was raining and he asked her to come inside instead. Kasparova repeatedly told

---

[2] In the messages, she refers to him as "arcanjel," meaning "archangel," which is a name Velasquez sometimes used.

Velasquez that she needed help parking her car. Velasquez finally acquiesced and went outside to help Kasparova parallel park her car.

As Velasquez was getting into Kasparova's car, she walked away and stood behind a car parked on the other side of the street. At the same time, a hooded man approached Kasparova's car from behind, opened the driver side door and pulled Velasquez out. During a brief struggle, Velasquez was shot twice, once in the thigh and once in the chest. As the shooter ran away, Kasparova walked past him and Velasquez, who was lying on the ground in the middle of the street, got into her car, and drove away.

Several eyewitnesses, including Christopher Odell, who lived directly across from Velasquez, witnessed and testified to these events. This incident was also captured on Odell's home security camera.

Police arrested Kasparova that night. During an interview with police, Kasparova admitted that she was there with Velasquez, but denied knowing who the shooter was. She also admitted that she left without trying to help Velasquez or calling 911.

Shortly after the shooting, Linares called Elias Guttierez for a ride. At the time, Guttierez was with Juan Rodriguez, Jesus Perez Arellano, and Alondra Servin. Perez testified that when they picked Linares up, he pulled Perez and Guttierez aside and told them that he had killed someone during an attempted robbery in West Seattle earlier that evening. According to Perez, Linares told them he went to "pull a lick"[3] with Kasparova and others. Linares told Perez "that the

---

[3] According to Perez, a "lick" means a robbery.

whole plan was that Anna was supposed to get the dude to come outside, parallel park the car, and as soon as he parallel parked the car, that's when Linares came up, opened the door, and they fought." Linares admitted that two shots were fired when he and Velasquez struggled for the gun, after which he ran away.

The next day, Linares also told Servin that he had shot someone, that it was supposed to be a robbery, and that he had been with "a girl" whom he did not identify by name. Like Perez, Servin testified that Linares told her that the shooting was "supposed to be a set up." Linares told Servin, as he had told Perez, that the girl he was with messaged Velasquez to park her car before going to hide and, when Velasquez tried to take the gun, Linares shot him twice.

Over the next few days, Linares exchanged phone calls with his close friend, Jhosselyne Caseres. Caseres had heard of Kasparova's arrest and, knowing of Linares' relationship with Kasparova, suspected Linares was involved. During the first call, Caseres asked Linares what was going on, to which Linares responded that he "couldn't lie" because Caseres "know[s him] too well." Both started crying and Caseres told Linares he should turn himself in. Linares told her that he did not want to talk about the situation on the phone, but that Kasparova had "[his] back" and was "down for [him]." During the second call, Linares recounted the details of the crime. According to Caseres, Linares told her that he had intended to rob Velasquez, who had tried to grab his gun. Caseres again suggested that he should turn himself in.

Caseres later called the Seattle Police Department tip line about the murder. She met with police and agreed to allow them to record another call with Linares.

During that call, Linares said that he was "duckin'," which Caseres took to mean that he was "hiding out." Linares then described Velasquez as a "creep" and said "I'm not tryin' to defend myse— I'm not trying to defend anything" but felt that "God won't let nothing happen if it . . . wasn't supposed to happen." Police arrested Linares at Perez's home on October 4, 2017.

The State charged both Kasparova and Linares with first degree murder with a firearm enhancement. Prior to trial, Kasparova moved to sever her case from Linares's pursuant to CrR 4.4(c)(2), arguing that Linares's statements to Perez, Servin, and Caseres were not admissible against her. The trial court ruled that Linares's statements to Caseres during the call recorded by law enforcement were testimonial and were not admissible against Kasparova. It granted Kasparova's motion to sever "unless the prosecuting attorney elects not to offer Linares' statements to Ca[s]eras made on October 3, 2017, in its case in chief; or deletes all references to Kasparova from these statements pursuant to CrR 4.4(c)(1)(i)(ii)." But it held that Linares's unrecorded statements to Caseres, as well as his statements to Perez and Servin, were not testimonial and were admissible as statements against Linares's penal interest.

The State elected to delete the references to Kasparova from Caseres's recorded call with Linares. The State proposed a number of redactions but Kasparova argued that there were several additional statements that needed to be removed. The trial court parsed through each statement and made individual rulings of admissibility.

Following their joint trial, the jury found both defendants guilty of first degree felony murder while armed with a firearm. Kasparova was sentenced to 240 months incarceration for the underlying charge, plus a 60 month firearm enhancement. She appeals.[4]

## ANALYSIS

On appeal, Kasparova raises seven issues. We address each in turn.

1. Severance

Kasparova first argues the trial court was required to sever her case from Linares's trial because his statements to Perez, Servin, and Caseres were inadmissible against her and violated her rights under the confrontation clause.

The confrontation clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. This protection has special significance when one codefendant has made statements to the police that implicate another defendant. State v. Wilcoxon, 185 Wn. App. 534, 540, 341 P.3d 1019 (2015) (citing Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968)). Because of this, CrR 4.4(c)(1) provides that

> A defendant's motion for severance on the ground that an out-of-court statement of a codefendant referring to him is inadmissible against him shall be granted unless:
>
> > (i) the prosecuting attorney elects not to offer the statement in the case in chief; or

---

[4] Linares likewise appealed his conviction. A panel of this court affirmed his conviction and sentence. See State v. Kasparova, No. 81144-4, slip op. (Wash. Ct. App. 2021) https://www.courts.wa.gov/opinions/pdf/811444.pdf.

(ii) deletion of all references to the moving defendant will eliminate any prejudice to him from the admission of the statement.

But if the codefendant's out-of-court statements are admissible against the moving defendant, severance is not required. State v. Dent, 123 Wn.2d 467, 483, 869 P.2d 392 (1994).

Kasparova contends the trial court erred in concluding that Linares's statements to Perez and Servin were admissible as statements against Linares's penal interest. ER 804(b)(3) provides that hearsay statements against the declarant's penal interest are admissible when the declarant is unavailable. A statement against penal interest is admissible when three requirements are met: (1) the declarant is unavailable to testify, (2) the declarant's statement must tend to subject him or her to criminal liability, and (3) the statement must be corroborated by circumstances indicating its trustworthiness. State v. Valladares, 99 Wn.2d 663, 668, 664 P.2d 508 (1983). Courts should assess a statement's reliability using a nine-factor reliability test. State v. Roberts, 142 Wn.2d 471, 497-98, 14 P.3d 713 (2000). The trial court's ruling on the admissibility of testimony under ER 804(b)(3) is reviewed for abuse of discretion. State v. Anderson, 112 Wn. App. 828, 834, 51 P.3d 179 (2002).

As a defendant with the privilege against self-incrimination, Linares is by definition unavailable as a witness. See ER 804(a)(1). Kasparova does not challenge this. Nor does she challenge the trial court's application of the nine-factor reliability test. Instead, she argues that the trial court erred when it admitted

Linares's statements as a whole, rather than considering each statement separately to conclude whether each was against his penal interest.

Kasparova relies on Roberts and Williamson v. United States, 512 U.S. 594, 114 S. Ct. 2431, 129 L. Ed. 2d 476 (1994), for this argument. In Roberts, the defendant sought to admit statements made by the codefendant, Cronin, which the defendant asserted were exculpatory and against Cronin's penal interests. 142 Wn.2d at 483. In a recorded confession to police, Cronin initially denied murdering the victim and claimed that Roberts had acted alone. Id. at 481-82. Later in the confession, Cronin admitted to participating in some of the actions that may have led to the victim's death, but continued to deny killing the victim. Id. at 482. The trial court concluded that the statement, as a whole, did not amount to a statement against Cronin's penal interest and excluded the recorded confession. Id. at 483.

On review, our Supreme Court rejected the "whole statement" approach and instead followed Williamson. Id. at 494. There, the Supreme Court concluded that the term "statement" in Federal Rule of Evidence 804(b)(3) means "a single declaration or remark." 512 U.S. at 599. The Court reasoned that people "tend not to make self-inculpatory statements unless they believe them to be true. This notion simply does not extend to the broader definition of 'statement.' The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts." Id. Because of this, the Court held that the rule "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." Id. at 600-01.

Adopting the Williamson approach, the Roberts court concluded that trial courts must examine a proffered hearsay narrative, separate the inculpatory portions from those that are self-serving, and exclude any self-serving statements from the narrative. Roberts, 142 Wn.2d at 492-94.

Kasparova contends the trial court erred in not excluding or redacting certain statements Linares made to Perez and Servin, which she contends were made in an attempt to shift blame from himself to Kasparova and were thus self-serving. We reject this argument. Each of the challenged statements implicates Linares as much as it implicates Kasparova and was not self-serving.

Kasparova argues that it was self-serving of Linares to say that he went to "pull a lick" with "Anna and a couple of his buddies," that the plan was for Kasparova to lure Velasquez outside by saying she needed help parking her car, and that Kasparova wanted to participate in the crime. But Kasparova's participation in the crime did not lessen Linares's criminal culpability. Linares's admission that he planned to rob Velasquez with Kasparova and that he shot Velasquez in the process certainly implicates Linares in the murder. And in none of the challenged statements did Linares deny his involvement, minimize his own culpability, or otherwise attempt to shift the blame to her.

Because Kasparova has not identified any self-serving statements shifting blame from Linares to Kasparova, the trial court did not err in concluding that the statements were admissible as statements against Linares's interest.

Kasparova next argues that Linares's statements were inadmissible because they violated her right to confront witnesses against her.

In Bruton, the United States Supreme Court ruled that a criminal defendant is denied his right of confrontation when a court admits a nontestifying codefendant's confession naming the defendant as a participant in the crime, even where the court instructs the jury to consider the confession only against the codefendant. 391 U.S. at 127-28. In Crawford v. Washington, 541 U.S. 36, 61, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the Supreme Court explained that the confrontation clause applies only to "testimonial" statements made by an out-of-court declarant.

To harmonize Bruton with Crawford, our Supreme Court held that "the confrontation clause applies only to situations that involve out-of-court statements made by nontestifying codefendants when such statements are testimonial." State v. Wilcoxon, 185 Wn.2d 324, 333, 373 P.3d 224 (2016). If a codefendant's statement is nontestimonial, "Bruton is inapplicable because such statements are outside the scope of the confrontation clause." Id. at 334. Under Wilcoxon, only Linares's testimonial statements implicating Kasparova would violate her confrontation clause rights.

The trial court ruled that Linares's statements to Perez and Servin and his first two calls with Caseres were not testimonial because their primary purpose was not to investigate a possible crime, create a record for trial, or gather evidence. Their testimony thus fell outside the scope of the confrontation clause.[5]

---

[5] Kasparova seems to argue that Wilcoxon is not binding on us because it is a "bare plurality." But five justices agreed that the confrontation clause applies only to testimonial statements; two justices simply disagreed about how to categorize a given statement as "testimonial." Wilcoxon, 185 Wn.2d at 336-38. Wilcoxon is binding on this court.

Kasparova also contends the trial court erred in admitting Linares's testimonial statements to Caseres in her recorded phone call and to the police during a post-arrest interrogation. Neither required severance here.

Because these statements were testimonial and therefore inadmissible against Kasparova, the trial court required the State to redact all of Linares's statements about Kasparova from these recordings. But there were several comments Caseres made about Kasparova in these statements that the court did not order the State to redact. Kasparova contends that admitting these references to her violated her right to confrontation.

The redacted recorded conversation between Linares and Caseres included two statements referring to Kasparova. The first was Caseres's comment that she had seen in the newspaper that Kasparova had been charged with murder. Second, Caseres told Linares that she had heard friends talking about Velasquez and saying "Anna was his girl and stuff." Caseres then said "Now, I'm thinking was that . . . just a jealous rage," which Linares vehemently denied.

These unredacted statements do not violate Kasparova's confrontation rights for two reasons. First, both statements were made by Caseres, who testified at trial and was therefore available for cross-examination. But more importantly, neither statement was incriminating. The jury was aware that Kasparova had been arrested for murder and they were instructed that the filing of any charges is only an accusation. And the statement that Kasparova was Velasquez's "girl" in no way implies that she was involved in the crime. Kasparova admitted she had dated Velasquez. Bruton does not apply unless the codefendant's statements

- 11 -

incriminate the defendant. Richardson v. Marsh, 481 U.S. 200, 208-11, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987); Dent, 123 Wn.2d at 487.

Likewise, references to Kasparova in Linares's police interrogation were not incriminating. First, police showed Linares several booking photos and asked if he recognized them. When Linares saw Kasparova's photo, he said he knew her because she had cut his hair but he did not know her name. Second, Detective Cooper told Linares that they were investigating a shooting "involving that girl." Neither of these references to Kasparova incriminates her in a planned robbery or the murder. Because Bruton does not apply, these statements did not violate the confrontation clause.

Linares's statements to Perez and Servin and his statements from his first two conversations with Caseres were admissible because they were nontestimonial statements against interest and admitting them did not violate the confrontation clause. Further, any testimonial statements about Kasparova made during Linares's recorded conversation with Caseres and his recorded police interview were not incriminating and their admission at trial did not violate her confrontation rights. Thus, the trial court did not err in denying Kasparova's motion to sever.

2. Cross-Examination of Perez

Kasparova next argues that her right to confrontation was violated when the trial court limited her cross-examination of Perez and prevented her from questioning him about his motivations for incriminating Linares.[6]

---

[6] The State argues that, pursuant to RAP 2.5(a), this court should decline to review this argument because the facts and argument presented on appeal were not presented below. Kasparova

The Sixth Amendment protects the right to conduct a meaningful cross examination of adverse witnesses. State v. Lee, 188 Wn.2d 473, 486-87, 396 P.3d 316 (2017). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). One permissible form of cross examination is directed at revealing possible biases, prejudices, or ulterior motives of a witness. Id. The right to cross examine witnesses, however, is not absolute. State v. Arredondo, 188 Wn.2d 244, 266, 394 P.3d 348 (2017). A trial court has the discretion to determine the scope of cross examination and to prohibit questioning of a witness, even a key witness, when the claimed bias is speculative or remote. State v. Benn, 120 Wn.2d 631, 651, 845 P.2d 289 (1993); State v. O'Connor, 155 Wn.2d 335, 350, 119 P.3d 806 (2005).

A limitation on cross-examination violates the confrontation clause where the testimony sought by the defendant, but excluded by the trial court, is (1) minimally relevant, (2) not so prejudicial as to disrupt the fairness of the fact-finding process at trial, and (3) the defendant's need for relevant but prejudicial information outweighs the State's interest in withholding that information from the jury. Arredondo, 188 Wn. 2d at 266 (citing State v. Jones, 168 Wn.2d 713, 720-21, 230

---

argued below that evidence relating to this arrest showed Perez's bias because, if the theft case were refiled, he would want to prevent Linares from testifying against him or diminish Linares's credibility as a witness. On appeal, Kasparova argues that Perez's potential bias was exacerbated by the fact that Perez was arrested for this theft just one day before Linares was arrested in Perez's home for Velasquez's murder. While it is true that Kasparova did not raise the fact that Perez had been arrested for this theft just one day before Linares was arrested for the murder, Kasparova did argue that evidence of Perez's arrest for theft shows his "motivation to shift blame to Mr. Linares." She also argued repeatedly that Perez was attempting to avoid being convicted of theft by incriminating Linares. Thus, this issue is sufficiently preserved and we choose to address it on its merits.

- 13 -

P.3d 576 (2010)). "No State interest is sufficiently compelling to preclude evidence with highly probative value." Id. We review de novo whether the trial court's evidentiary rulings violated a defendant's Sixth Amendment rights. State v. Orn, 197 Wn.2d 343, 350, 482 P.3d 913 (2021).

Prior to trial, Kasparova moved to admit evidence that, approximately two weeks after the murder, Perez and Linares were arrested for an unrelated theft. They were both charged but the cases were later dismissed without prejudice. Perez allegedly tried to blame Linares for the theft. Kasparova argued that this evidence demonstrated Perez's bias against Linares and a potential motivation to lie. The court excluded evidence of Perez's arrest or his purported attempt to blame Linares for it because the statute of limitations on that charge had run and the court deemed the evidence irrelevant.

Kasparova argues that even if Perez was not at risk of prosecution for the theft at the time of trial, he did face this risk when he told law enforcement that Linares had confessed to shooting Velasquez. She maintains that the evidence of Perez's arrest of theft and his attempt to blame Linares for that crime was relevant to Perez's bias against Linares. We agree, but nonetheless conclude that the error was harmless.

State v. Orn is illustrative here. Orn was convicted of attempted first degree murder after shooting the victim, Seamans, multiple times. Orn, 197 Wn.2d at 349-50. After the shooting, Seamans was investigated for several unrelated felonies. Id. at 349. Seamans agreed to work as a confidential informant for the police department and, in exchange, law enforcement agreed not to refer these felonies

to the prosecutor. Id. At trial, the court granted the State's motion in limine to exclude Seamans' informant agreement and barred Orn from cross-examining Seamans about it. Id. at 350. The only question Orn was permitted to ask about the agreement was "'[I]sn't it true that since this incident, you have actually worked with Kent Police Department?'" Id.

Our Supreme Court found that the trial court abused its discretion in limiting Orn's cross-examination, which resulted in a violation of Orn's Sixth Amendment rights. Id. at 358-59. The limitation of Orn's examination to one misleading question left the jury with incomplete information and potentially incorrect inferences from which to assess his credibility. Id. at 355. The court noted that "the right to cross-examine for bias is especially important where, as here, that bias stems from a witness's motive to cooperate with the State based on the possibility of leniency or the desire to avoid prosecution. Id. at 352 (citing Delaware v. Van Arsdall, 475 U.S. 673, 677, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)). Such evidence is particularly probative of a witness's credibility because it exposes that witness's motivation in testifying. Id. at 354.

Like in Orn, the trial court in this case also prevented Kasparova from asking questions of Perez that would have elicited specific reasons why Perez might have been biased against Linares based on his desire to limit his own criminal liability. She was not permitted to inform the jury that Perez was facing potential criminal liability at the time he spoke with police and this potential liability may have motivated him to lie. Because Perez was the only witness who testified to having

- 15 -

heard Kasparova and Linares planning the crime before it occurred, his credibility was a critical issue at trial.

While the statute of limitations had run on the misdemeanor theft charges by the time of trial, it certainly had not run at the time that Perez gave his initial statements to police. If he had been lying to shield himself, Perez might then have felt pressured to keep his story consistent at trial to avoid facing charges of obstruction of justice or providing a false report to law enforcement. Thus, the proffered evidence was still relevant to Perez's credibility.

The State makes no argument that this evidence was so prejudicial as to disrupt the fairness of the trial, nor does it articulate its interests in withholding that information from the jury. As such, we cannot conclude such evidence was unfairly prejudicial. Likewise, Kasparova's interest in providing the jury with all relevant information to determine Perez's credibility outweighs any State interest in excluding it. The trial court thus erred in limiting Kasparova's cross-examination of Perez.

But we conclude the error was harmless. "Violations of the rights to present a defense and to confront adverse witnesses at trial are subject to constitutional harmless error review." Id. at 359. Under this standard, the State must prove beyond a reasonable doubt that the verdict would have been the same without the error. Id. The State has met that burden of proof here.

Despite Kasparova's assertions to the contrary, there was overwhelming evidence implicating her in the crime. Caseres testified Kasparova and Linares were a couple. Kasparova sent Facebook messages to a friend indicating she

wanted to "get" Velasquez and have him "bopped." Kasparova admitted she was present when Velasquez was shot. Her text messages to Velasquez confirm she asked him repeatedly to come outside to parallel park her car. Servin testified that Linares told her that he and a girl planned to rob Velasquez after the girl lured the victim out of his house to park her car. Odell's video showed Kasparova walking away from the scene of the shooting without even a glance at the severely wounded Velasquez. Even if the jury had found Perez not credible or biased against Linares, the State has established that the verdict would have been the same without the limitation on Perez's cross examination. The trial court's error was harmless beyond a reasonable doubt.

3. Suppression of Witness Testimony

Kasparova next argues the court erred in denying her motion to suppress Caseres's testimony as a sanction for the State's failure to disclose the fact that Caseres had received money for cooperating with the police.

CrR 8.3(b) allows the trial court to "dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." A movant must show by a preponderance of the evidence (1) arbitrary action or misconduct by the government, and (2) prejudice affecting the movant's right to a fair trial. State v. Koeller, 15 Wn. App. 2d 245, 251, 477 P.3d 61 (2020); State v. Kone, 165 Wn. App. 420, 433, 266 P.3d 916 (2011). Government misconduct does not require that the State act dishonestly or in bad faith. Kone, 165 Wn. App. at 433. Simple mismanagement is enough. Id. (citing State v. Blackwell, 120

Wn.2d 822, 831, 845 P.2d 1017 (1993)). A violation of a State's discovery obligations can support a finding of governmental misconduct. State v. Salgado-Mendoza, 189 Wn.2d 420, 429, 403 P.3d 45 (2017).

Although CrR 8.3(b) explicitly authorizes dismissal as a sanction for misconduct, a trial court may entertain a less severe remedy. City of Seattle v. Holifield, 170 Wn.2d 230, 239, 240 P.3d 1162 (2010). Indeed, "[d]ismissal is not justified when suppression of evidence will eliminate whatever prejudice is caused by the action or misconduct." State v. McReynolds, 104 Wn. App. 560, 579, 17 P.3d 608 (2000).

Generally, we review a trial court's decision on a CrR 8.3(b) motion to dismiss for an abuse of discretion.[7] Kone, 165 Wn. App. at 433. A trial court abuses its discretion when its decision is manifestly unreasonable, based on untenable grounds, or made for untenable reasons. Id.

Shortly before trial, defense counsel interviewed Caseres and learned she had received $1,000 from Crime Stoppers as a reward for the information she gave to the police. Caseres testified that she had called the Seattle Police Department tip line because she wanted "justice for Eddie"[8] and she wanted Linares to turn himself in. After Detective Cooper interviewed Caseres, he referred her to Crime Stoppers, an independent private organization that offers a $1000 reward for

---

[7] Relying on State v. Warner, 125 Wn.2d 876, 889 P.2d 479 (1995), Kasparova contends that, because the court did not issue a written order, the standard of review is de novo. However, in that case, the trial court had made no mention of CrR 8.3(b) in either its written order of dismissal or in its oral ruling. Id. at 882. Therefore, the Supreme Court concluded that CrR 8.3(b) was not the basis of the dismissal and, accordingly, reviewed the case de novo under the error of law standard. Id, at 882-83. Here, it is clear that court's decision was based on Cr.R 8.3(b) and, therefore, we review this issue for an abuse of discretion.

[8] Edixon Velasquez went by "Eddie."

- 18 -

information provided in any homicide case. Detective Cooper did not disclose to the defense that Caseres had received money for assisting in the investigation.

Kasparova moved to suppress Caseres's testimony pursuant to CrR 8.3(b). The trial court denied the motion. It found that while the information should have been included in Detective Cooper's report, the delay in disclosing the payment caused no prejudice to Kasparova. The court found that Caseres had received money, not as an incentive to cooperate with law enforcement, but as a post-statement payment by Crime Stoppers. It also found no evidence that Caseres made her statements so that she could obtain Crime Stoppers money and no evidence the defendants sought a trial continuance when they learned of the payment.

The State concedes that the failure to provide this impeachment evidence constitutes at least mismanagement. We accept this concession and agree that Kasparova demonstrated mismanagement. But we conclude the late disclosure of this evidence was not prejudicial. First, Kasparova had time to investigate the details of the reward. She discovered the payment on October 9, two weeks before trial began and more than four weeks before Caseres testified on November 13. Second, Kasparova did not request a continuance to investigate the details of the reward. Third, Caseres and Detective Cooper both testified extensively about the reward and Kasparova cross-examined both about the reward. Finally, there is nothing to suggest that Caseres had acted as a confidential informant on any other occasion and it is unclear what, if anything, Kasparova would have needed to

investigate. The trial court did not abuse its discretion in denying Kasparova's CrR 8.3 motion to suppress.

    4. <u>Probable Cause for the Search Warrant</u>

Kasparova contends the trial court erred in concluding that the warrant authorizing the search of her Facebook account was supported by probable cause. We disagree.

Our constitutions protect individual privacy against warrantless state intrusion. U.S. CONST. amend IV; WASH. CONST. art. I, § 7; <u>State v. Denham</u>, 197 Wn.2d 759, 766, 489 P.3d 1138 (2021). A court may issue a search warrant only after a showing of probable cause. <u>State v. Haggard</u>, 9 Wn. App. 2d 98, 109, 442 P.3d 628 (2019), <u>aff'd,</u> 195 Wn.2d 544, 461 P.3d 1159 (2020). Probable cause exists if the warrant's supporting affidavit sets forth facts and circumstances sufficient to establish a reasonable inference that a person is probably involved in criminal activity and the evidence of the crime could be found in the place to be searched. <u>Id</u>. "'[P]robable cause requires a nexus between criminal activity and the item to be seized, and also a nexus between the item to be seized and the place to be searched.'" <u>State v. Thein</u>, 138 Wn.2d 133, 140, 977 P.2d 582 (1999) (quoting <u>State v. Goble</u>, 88 Wn. App. 503, 509, 945 P.2d 263 (1997)).

We generally review the issuance of a search warrant only for abuse of discretion, giving great deference to the issuing judge or magistrate. <u>State v. Neth</u>, 165 Wn.2d 177, 182, 196 P.3d 658 (2008). In this case, Kasparova moved to suppress evidence from Facebook, arguing there was no probable cause for the warrant. When the trial court evaluates such an argument at a suppression

hearing, it acts in an appellate-like capacity and its assessment of probable cause is a legal conclusion that we review de novo. Id.

The trial court ruled:

> I have reviewed the affidavit several times since this motion was made to refresh my memory of what it said and to try to look at it from a neutral and detached standpoint. What I see is fairly simple, which is that Anna Instagram'd the victim, the alleged victim, Caseres got a Facebook message from Linares, Linares is a Facebook friend of Kasparova.
>     Based on the facts set forth in the affidavit, there was a suspicion that they had acted in concert in this murder, and Kasparova, after the arrest, had her sister post a message to her Facebook account, "her" being Kasparova's Facebook account, with a claim regarding what happened at the time of the murder. Also that Caseres had Facebook conversations with Elias [Guitierrez].
>     . . .
>     Judges are allowed to rely on their common sense and experience to draw reasonable inferences, and the communication via Facebook by Ms. Kasparova regarding the day in question and the plan in question is enough to me on its own to provide probable cause to search Facebook.

We agree the affidavit supporting the search warrant established probable cause to believe that Kasparova and Linares planned this crime and that relevant evidence could be found in their Facebook records. The affidavit included the details of the murder as seen on the surveillance footage, including facts showing that Kasparova and the shooter appeared to be acting in concert. The affidavit also included Kasparova's acknowledgement that she was there when Velasquez was shot and that she did nothing to help him afterwards. It also described Linares's confessions to Caseres that he and Kasparova had planned to rob Velasquez. Further, it described how Kasparova had called her sister from the King County Jail to instruct her to post a message on her Facebook account to claim she had been held at gunpoint and was robbed along with Velasquez. This

- 21 -

statement was inconsistent with the version of events she recounted to the police but was an admission that she was present during the shooting and that a robbery or attempted robbery had occurred. These facts created a reasonable inference that evidence of the crime of felony murder could be found on her Facebook account.

Kasparova does not dispute that the affidavit established probable cause to believe that she and Linares committed the murder. Instead, she argues that the affidavit does not provide any nexus between her Facebook account and the crime. Specifically, she contends that there was no indication that she frequently communicated with Velasquez on Facebook, or that she used Facebook to plan or carry out the crime.

She relies on State v. Phillip, 9 Wn. App. 2d 464, 452 P.3d 553 (2019), review denied, 194 Wn.2d 1017, 455 P.3d 140 (2020) for this argument.[9] In that case, Phillip lived in Oregon but was suspected of murdering his ex-girlfriend's new boyfriend in Washington. Id. at 467-68. Based on the victim's relationship to Phillip's ex-girlfriend, Johnson, and Phillip's frequent, flirtatious communications with Johnson, the police sought a warrant for Phillip's cell-site location information. Id.

On appeal, the court noted that the supporting affidavit demonstrated frequent cell phone communications between Johnson and Phillip, suggesting that

---

[9] Notably, this published opinion focuses on a subpoena for cell phone records, but includes significant portions of State v. Phillip, No. 72120-8-I, slip. op. (Wash. Ct. App. Aug. 29, 2016) (unpublished), https://www.courts.wa.gov/opinions/pdf/721208.pdf, an unpublished opinion in the same case which examined whether the police had probable cause for a search warrant for cell phone records. Kasparova, however, relies almost exclusively on language the court quoted from the 2016 unpublished opinion.

Phillip was jealous of the victim, but it concluded that these facts "do not create a reasonable inference that Phillip was involved in [the victim's] death or that evidence relating to [the victim's] death would likely be found in Phillip's cell phone records." Id. at 471 (quoting State v. Phillip, No. 72120-8-I, slip op. at 9-12, (Wash. Ct. App. Aug. 29, 2016) (unpublished).[10]

Phillip is distinguishable. Here, unlike in Phillip, there was uncontested probable cause that Kasparova was involved in Velasquez's murder. Also unlike Phillip, the affidavit presented evidence that Linares and Kasparova had planned the crime together and had acted in concert when carrying it out. Finally, the facts in the affidavit demonstrated that Kasparova asked her sister to use her Facebook account to publicly tell a false story about the robbery and shooting. The police were not merely speculating that the Facebook account might reveal communications between Kasparova and Linares, or between Kasparova and Velasquez. They had concrete evidence that Kasparova sought to use Facebook to discuss the crime itself. The search warrant was supported by probable cause and the trial court did not err in denying Kasparova's motion to suppress evidence seized as a result of the warrant.

5. Admissibility of Facebook Messages

Kasparova next asserts that several Facebook messages were inadmissible because they were highly prejudicial under ER 403 and inadmissible under ER 404(b). We find no abuse of discretion in the trial court's decision to admit this evidence.

---

[10] http://www.courts.wa.gov/opinions/pdf/721208.pdf

Kasparova sought to exclude portions of her Facebook messages with Maryooma, arguing they were unrelated to Velasquez's murder. She objected to the admissibility of a conversation in which Kasparova told Maryooma that "money team green"—a group or individual—had robbed Linares. She asked Maryooma to message "Money team green" to ask if they had "fire." She also asked Maryooma to post "who has fire."

The trial court ruled that these messages were relevant to demonstrate a relationship between Kasparova and Linares but agreed that the reference to "fire" should be redacted because, without anyone to explain what "fire" meant, the court was concerned that the jury would infer that it meant a gun.

Kasparova argues that the "money team green" messages were inadmissible under ER 403 and ER 404(b). We review a trial court's decision to admit evidence under these rules for abuse of discretion. Arredondo, 188 Wn.2d at 256 (ER 404(b)); State v. Luvene, 127 Wn.2d 690, 707, 903 P.2d 960 (1995) (ER 403).

Kasparova argues the trial court should have excluded these messages because they had "dubious" relevance and the probative value was outweighed by its prejudicial impact. She contends the messages were highly prejudicial because they implied that she and Linares were trying to find "money team green" for "some nefarious purpose."

The trial court agreed with the State that the evidence was admissible to show not only the existence of a relationship between Kasparova and Linares, but also the closeness of that relationship. It rejected the argument that the

conversation constituted a bad act under ER 404(b) because "all she's saying from the first two sentences is [Linares] was robbed by them, let's go find them."

Under ER 403, "[a] trial judge has wide discretion in balancing the probative value of evidence against its potentially prejudicial impact." State v. Rivers, 129 Wn.2d 697, 710, 921 P.2d 495 (1996). Kasparova has not demonstrated any abuse of discretion. First, the statements were relevant to show the significance of the bond between Kasparova and Linares, a fact Kasparova challenged at trial. During closing arguments, Kasparova argued that she had known Linares for only two months and they "were casually dating." The trial court was within its discretion to find that the Facebook messages had probative value of the depth of the codefendants' relationship.

Second, the record does not support the contention that this evidence was unfairly prejudicial to Kasparova. A danger of unfair prejudice exists when evidence is more likely to stimulate an emotional response than a rational decision. State v. Taylor, 193 Wn.2d 691, 696-697, 444 P.3d 1194 (2019). The trial court reasonably concluded that the Facebook messages between Kasparova and her friend, given their cryptic content, were unlikely to stimulate such a response.

Kasparova also contends that the evidence was inadmissible under ER 404(b) as evidence of a prior bad act. Under ER 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." The rule covers "misconduct" or "acts used to show the character of a person to establish that the person acted in conformity

with it on a particular occasion." State v. Everybodytalksabout, 145 Wn.2d 456, 466, 39 P.3d 294 (2002).

The trial court concluded that the messages were not evidence of any misconduct or character evidence because the messages were not being offered to show that any prior act had occurred. We agree with this analysis. The State did not offer this evidence to argue that Kasparova had engaged in any misconduct or to show her propensity to engage in an armed robbery. For this reason, the court did not err in overruling Kasparova's ER 404(b) objection and did not abuse its discretion in admitting the Facebook messages.

6. Prosecutorial Misconduct

Kasparova contends that the prosecutor engaged in misconduct by vouching for the credibility of State witnesses, referencing evidence the court had excluded, impugning defense counsel, shifting the burden of proof, and failing to properly redact an exhibit as ordered. We have carefully reviewed each of these arguments and the transcript and conclude that either no misconduct occurred or the errors were cured by the trial court.

A prosecutor must ensure that they do not violate a defendant's right to a constitutionally fair trial. State v. Monday, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). To establish prosecutorial misconduct, a defendant must show that the prosecuting attorney's statements were both improper and prejudicial. State v. Allen, 182 Wn.2d 364, 373, 341 P.3d 268 (2015).

We determine whether the defendant was prejudiced under one of two standards of review. State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012).

If the defendant made a timely objection at trial, she must demonstrate that any improper conduct "resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." Allen, 182 Wn.2d at 375. However, when a defendant fails to object at trial, "the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Emery, 174 Wn.2d at 760-61. In order to prevail under this heightened standard, the defendant must show that (1) no curative instruction could have eliminated the prejudicial effect, and (2) there was a substantial likelihood the misconduct resulted in prejudice that affected the verdict. Id. at 761.

Reference to Excluded Evidence

Kasparova first argues that the prosecutor committed misconduct during closing argument when he referred to evidence that the court had excluded. During rebuttal argument, the prosecutor asked the jury if they remembered Kasparova's Facebook conversation with Maryooma about "money team green" and said "[s]he said: Hey you guys know this—you know this team money green? Hit 'em up. Ask them if they have fire." Both defendants objected because the trial court had excluded the sentence referring to fire. The court sustained the objections and struck the argument.

It is improper for a prosecutor to refer to facts not in evidence before the jury. See State v. Russell, 125 Wn.2d 24, 88, 882 P.2d 747 (1994). The State concedes that it was misconduct for the prosecutor to refer to the excluded evidence during closing arguments.

- 27 -

Kasparova argues that, although it was stricken, this misconduct was not cured by the court's instruction because the jury received copies of the redacted messages during their deliberations and would be able to extrapolate what the redacted messages said from the prosecutor's comments. She contends that this disclosure affected the jury's verdict because, if the jury concluded that "fire" was a firearm, it drastically undermined her affirmative defense that she did not know Linares had a gun.

But the trial court has discretion to decide the adequacy of an instruction admonishing the jury and directing it to disregard evidence or argument. Because the trial judge is in the position to impartially observe and appraise the impact of inadmissible testimony or an improper argument on the jury, we generally respect that court's discretionary judgment that a corrective instruction and admonition effectively cures an error. State v. Thrift, 4 Wn. App. 192, 195-196, 480 P.2d 222 (1971). The trial court had excluded the reference to "fire" because it did not know what that phrase meant in the context of the messages. It was in the best position to determine if the prosecutor's error in mentioning the statement about "fire" required more than the standard instruction to disregard it.

Moreover, the jury was instructed to "disregard any remark, statement, or argument that is not supported by the evidence." The prosecutor's comment that Kasparova asked her friend about "fire" was not supported by the evidence because that portion was redacted from the exhibit the jury received and there was no testimony that those statements were part of the conversation. We presume the jury followed the court's instructions to disregard closing remarks. State v.

- 28 -

Swan, 114 Wn.2d 613, 661-62, 790 P.2d 610 (1990).  Based on this record, we cannot conclude the curative instruction was ineffective and Kasparova should be given a new trial.

Impugning Defense Counsel

Next, Kasparova argues that the prosecutor impugned the role of defense counsel and presented the jury with a false choice when he argued that defense counsel needed the jury to "buy off on" certain facts.

In closing, Kasparova argued that she did not know Linares had a gun, did not know he was planning a robbery, and did not know a shooting would occur. She maintained that while she may have planned to create a scene with Velasquez, she had no involvement in planning a robbery.  Linares argued in closing that the State had failed to prove that he was the shooter.

In rebuttal, the prosecutor argued that "in order to advance both of these theories, the defense lawyers need you to buy off on several things."  The prosecutor maintained that "[t]heir argument is that–again, Kasparova's argument, Linares [is] the big bad guy, she had nothing to do with it.  Linares's argument is I'm not the shooter.  And if I was, I'm a liar."  Kasparova objected, arguing that this mischaracterized her argument.  The trial court overruled this objection.  The prosecutor then repeated that defense counsel wanted the jury to "buy off on" the theory that both the Instagram messages between Kasparova and Velasquez and the Facebook messages between Kasparova and Maryooma were "misunderstood."

Kasparova contends that the prosecutor impugned defense counsel with the colloquial comment that the jury should not "buy off on" their theories. It is improper for a prosecutor to disparagingly comment on defense counsel's role or impugn defense counsel's integrity. State v. Thorgerson, 172 Wn.2d 438, 451, 258 P.3d 43 (2011). But a prosecutor may argue that the evidence does not support the defense theory of the case. State v. Lindsay, 180 Wn.2d 423, 431, 326 P.3d 125 (2014).

While somewhat tactless, the prosecutor's statements did not rise to the level of impugning defense counsel. He did not undermine defense counsel's veracity or integrity. The prosecutor's remarks focused on the credibility of the arguments in light of the evidence. "[I]solated remarks calling defense arguments 'bogus' and 'desperate,' while strong and perhaps close to improper, do not directly impugn the role or integrity of counsel, and such isolated comments are unlikely to amount to prosecutorial misconduct." Thorgerson, 172 Wn.2d at 466.

Shifting Burden of Proof

Kasparova also argues these same comments shifted the burden of proof to the defendant. It is misconduct for the prosecutor to shift the burden of proof to the defendant. State v. Miles, 139 Wn. App. 879, 890, 162 P. 3d 1169 (2007). It is improper burden-shifting to argue that the jury can acquit a defendant only if they believe the defendant's testimony and disbelieve the State's witnesses. Id. Such an argument presents the jury with a false choice, because the jury is free to conclude that none of the witnesses were credible and to acquit on that basis. Id.

But we do not see how the prosecutor presented the jury with a false choice. The prosecutor did not say that the jury could acquit only if it agreed with Kasparova's theory of the case. Rather, it argued that the evidence did not support her argument. See Lindsay, 180 Wn.2d at 431 ("A prosecutor can certainly argue that the evidence does not support the defense theory.") The prosecutor's argument did not improperly shift the burden of proof to Kasparova.

Appeal to Emotions

Kasparova next argues that prosecutor impermissibly appealed to the emotions of the jurors when he repeatedly argued that they should rely on their "collective common sense" in reaching a verdict.

Appeals to the jury's passions and prejudices are improper, as it is a "prosecutor's duty to 'see a verdict free of prejudice and based on reason.'" State v. Echevarria, 71 Wn. App. 595, 598, 860 P.2d 420 (1993) (quoting State v. Huson, 73 Wn.2d 660, 663, 440 P.2d 192 (1968)). "A prosecutor acts improperly by seeking a conviction based upon emotion rather than reason." State v. Craven, 15 Wn. App. 2d 380, 385, 475 P.3d 1038 (2020), review denied, 197 Wn.2d 1005, 483 P.3d 784 (2021).

During closing, the prosecutor argued that

> The law isn't some mystic thing. All right? It's supposed to represent us as a society, our shared beliefs, our shared understanding, our shared morals. The law is a codification of that. And that's what you have before you in the form of those jury instructions.
>
> At first blush, they might seem complicated, wordy, maybe sometimes confusing. But if you take the time to read it and think about it, you'll see that it makes sense. That's because the law is rooted in our shared common intellectual sense, and it's rooted in our shared common moral sense.

Our shared common intellectual sense and our shared common moral sense. What that means is if you apply the law to the evidence in this case and if you follow the law, you'll reach the correct verdict. And doing so will make good common sense.

Later, the prosecutor argued that the jury should find the defendants guilty because "it's the only conclusion that lines up with your common sense." He reiterated this theme throughout his rebuttal. Kasparova did not object.

In <u>Craven</u>, a decision that issued after Kasparova's trial, this court concluded that the same prosecutor's reference to a "shared common intellectual sense" and "shared common moral sense" amounted to prosecutorial misconduct. 15 Wn. App. 2d at 385-90. The prosecutor, however, used those phrases in a materially different way. In that case, he argued:

> [PROSECUTOR]: If we follow the law, we will reach the correct verdicts. If you follow the law, you will reach the correct verdicts. And when do you that, it will feel right here intellectually.
> . . .
>
> It will feel right here intellectually [indicating the head]. Remember our shared common intellectual sense. It will feel right here morally [indicating the heart], our shared common moral sense. That's the law, and it should feel right here [indicating the gut or stomach].

<u>Id.</u> at 386. We concluded that this argument was improper, reasoning that

> [e]quating 'common intellectual sense' with 'common moral sense,' invited jurors to give the same weight to their rationality as to their emotions and instincts. By arguing 'only [guilty] verdicts make sense' when also arguing the law must 'make sense' in the head, heart, and gut, the prosecutor told jurors that arriving at a guilty verdict was as much emotional as intellectual. This can be understood only as an appeal to considerations other than the reasoned, intellectual application of law to facts. It risked a conviction based upon reasons other than the evidence.

Id. at 387-88.  The court noted that such an argument runs contrary to the notion that jurors must "set aside their biases and intellectually apply the law to the facts, even if that result is distasteful or disappointing."  Id. at 389.

Although in both cases the prosecutor referred to a shared common intellectual and common moral sense, the prosecutor here did not argue that the verdict should feel right in the "head, heart, and gut."  Nor did he invite the jurors to give the same weight to their rationality as to their emotions and instincts, the problem we identified in Craven.  The prosecutor encouraged the jury to use its common sense, which, by itself, does not imply that reaching a verdict was as much emotional as intellectual.  See State v. Balisok, 123 Wn.2d 114, 119, 866 P.2d 631 (1994) (jurors are expected to use their common sense when reaching a verdict).  It was not misconduct for the prosecutor to encourage the jury to use its common sense in evaluating the evidence and the arguments of the parties.

Disregarding the Trial Court's Ruling

Kasparova argues the prosecutor committed misconduct by disregarding the trial court's order directing the parties to redact any reference to Kasparova's work as a "bikini barista."

The trial court granted a pretrial motion to redact the word "bikini" from references to Kasparova's work as a "bikini barista" to avoid inferences about Kasparova's character.  At trial, the court admitted Kasparova's interview with police as Exhibit 18 and the State played the recording for the jury.  Kasparova did not object.

Kasparova now challenges this exhibit, arguing that it was not properly redacted. It appears from the record that the State inadvertently failed to redact each reference to the word "bikini."

The word at issue here occurs at approximately 4:25 in Exhibit 18. The word is spoken quickly and falls in the middle of the following sentence: "I was just a _____ barista, just trying to get my license for my hair. . . ." This interview was transcribed for the parties' use pretrial and, in that transcript, the sentence was written as "I was just a beginning barista, just trying to get my license for my hair. . . ." It appears the prosecutor used this typed version of the transcript to locate and redact any mention of the word "bikini" and, because of this transcription error, simply missed it in the recording.

This passing and uncertain reference to her work as a "bikini barista" was not misconduct so flagrant and ill-intentioned that it could not have been remedied by a curative instruction. While disregarding a court order is certainly misconduct, it is not clear that that occurred here. The parties clearly thought the word in question was "beginning" and not "bikini." But even assuming it was misconduct, the jury could have effectively been directed to disregard the comment. Kasparova does not contend that it could not have been cured, but, instead, merely argues that it "had the potential to impugn [her] character before the jury, and was thus prejudicial." Any error here could have been cured by a curative instruction.

Vouching for the Credibility of Witnesses

Kasparova contends that the prosecutor committed improper vouching when he asked the witnesses about their truthfulness and when he used the phrase "we know" in closing arguments.

It is improper for a prosecutor to state a personal belief as to the credibility of a witness. State v. Allen, 176 Wn.2d 611, 631, 294 P.3d 679 (2013). "Improper vouching generally occurs (1) if the prosecutor expresses his or her personal belief as to the veracity of the witness or (2) if the prosecutor indicates that evidence not presented at trial supports the witness's testimony." State v. Ish, 170 Wn.2d 189, 196, 241 P.3d 389 (2010).

During its case-in-chief, the prosecutor asked Caseres and Servin if they were truthful with detectives and while giving testimony. Kasparova objected to this testimony and the court struck it from the record.

Kasparova argues the prosecutor improperly vouched for Caseres and Servin when he questioned them about their truthfulness. While it is improper to ask a witness if another witness is testifying truthfully, State v Hughes, 118 Wn. App. 713, 725-26, 77 P.3d 681 (2003), we have found no case holding that it is improper to ask a witness if they are telling the truth in their own statements and testimony. Moreover, asking a witness if they testified truthfully does not express the prosecutor's personal opinion as to the witness's veracity.

Even if improper, Kasparova cannot demonstrate prejudice. The trial court sustained Kasparova's objections and struck the statements from the record. The jury was instructed that "If evidence was not admitted or was stricken from the

record, then you are not to consider it in reaching your verdict." We presume the jury properly disregarded the comment. Thus, any potential prejudice was cured.

Later, during closing arguments, the prosecutor told the jury that the evidence was "clear" and "overwhelming." After the summarizing the elements of the crime, he said "We know all this to be true. The evidence proves it all to be true. The evidence proves it beyond a reasonable doubt." Kasparova did not object to this argument, but now maintains that the prosecutor's use of the phrase "we know all this to be true" constituted improper witness vouching.

We have recognized that a prosecutor's use of the phrase "we know" may blur the line between legitimate summary and improper vouching. State v. Robinson, 189 Wn. App. 877, 894-95, 359 P.3d 874 (2015) (citing United States v. Younger, 398 F.3d 1179. 1191 (9th Cir. 2005)). But if the phrase is used to marshal evidence, rather than to attempt to align the jury against a defendant on improper grounds, it is not misconduct. Id. at 895. The prosecutor here did not use the phrase "we know" in an impermissible way. Nothing in his comment suggested a source of special knowledge or expressed a personal belief in the veracity of the witnesses. Instead, he used this phrase to marshal the evidence and argue that the State had proved each element of the crime. We find no misconduct.

7. Consideration of Kasparova's Youthfulness at Sentencing

Finally, Kasparova contends that she is entitled to resentencing because the trial court's decision not to grant a mitigated sentence was based on an incorrect understanding of the law. We reject this argument.

- 36 -

Kasparova asked the court to impose an exceptional sentence based on her youth and cognitive abilities. In a presentence report, Kasparova argued she was just 21 years old at the time of the crime, with an intelligence quotient (IQ) of 74, and the functional intelligence of a middle schooler. Kasparova contended that the combination of her youth and deficient intellectual abilities impaired her ability to weigh the consequences of her actions.

Kasparova requested a mitigated sentence of 183 months and asked for the 60-month firearm enhancement to run concurrently to that sentence. This request was contrary to two sentencing statutes. Generally, sentencing courts have the authority to impose a sentence outside the standard sentence range for an offense if it finds that there are "substantial and compelling reasons justifying an exceptional sentence," including whether the defendant's capacity to appreciate the wrongfulness of his or her conduct was significantly impaired. RCW 9.94.535(1)(e). But RCW 9.94.540(1)(a) dictates that an adult offender convicted of murder in the first degree "shall be sentenced to a term of total confinement not less than twenty years." This term of confinement "shall not be varied or modified under RCW 9.94.535." Id.

Similarly, there is a mandatory five year enhancement if the State proves a firearm was used in the commission of the crime. RCW 9.94A.533(3)(a). This firearm enhancement must run consecutively to all other sentencing provisions. RCW 9.94A.533(3)(e). In State v. Brown, 139 Wn.2d 20, 29, 983 P.2d 608 (1999) overruled in part by State v. Houston-Sconiers, 188 Wn.2d 1, 21, 391 P.3d 409

(2017), the Supreme Court held that "judicial discretion to impose an exceptional sentence does not extend to a deadly weapon enhancement."

The sentencing court concluded that it did not have the discretion to impose a sentence below the statutory mandatory minimum 20-year sentence and the mandatory consecutive 5-year firearm enhancement. The court imposed 240 months incarceration for the underlying charge, plus the 60 month firearm enhancement.

Kasparova first claims that the sentencing court had the statutory authority under RCW 9.94A.535 to run the firearm enhancement concurrently with the substantive sentence. Brown is dispositive of this argument. Kasparova concedes that her argument is inconsistent with Brown, but contends that In re Pers. Restraint of Mulholland, 161 Wn.2d 322, 329-30, 166 P.3d 677 (2007), and State v. McFarland, 189 Wn.2d 47, 54, 399 P.3d 1106 (2017), tacitly overruled Brown and give the court the statutory authority to run a firearm enhancement concurrently with an underlying sentence.

We rejected this argument in State v. Mandefero, 14 Wn. App. 2d 825, 473 P.3d 1239 (2020), and State v. Wright, No. 37445-9-III, slip. op., at 15 (Wash. Ct. App. Aug. 24, 2021).[11] Both the Wright and Mandefero courts distinguished Mulholland and McFarland because they dealt with sentences for firearm-related offenses, and not the mandatory firearm enhancement. Wright, slip op. at 15; Mandefero, 14 Wn. App. at 832. "Brown remains good law as applied to adult offenders." Wright, slip op. at 17.

---

[11] https://www.courts.wa.gov/opinions/pdf/374459_pub.pdf

Next, Kasparova argues that the sentencing court abused its discretion when it failed to recognize that it has the constitutional discretion to impose an exceptional sentence on the basis of her youth and low IQ.  While our Supreme Court has held that courts have the discretion to consider age as a mitigating factor, State v. O'Dell, 183 Wn.2d 680, 695-96, 358 P.3d 359 (2015), it has not held that this discretion extends to minimum sentences mandated under RCW 9.94.540(1)(a), or to mandatory firearm enhancements under RCW 9.94A.533(3)(a) for offenders 21 years of age and older.

In Houston-Sconiers, in the context of sentencing juvenile offenders, our Supreme Court held that under the Eighth Amendment, sentencing courts "must consider mitigating qualities of youth at sentencing and must have discretion to impose any sentence below the otherwise applicable [Sentencing Reform Act] range and/or sentence enhancements." 188 Wn.2d at 21.  But in Mandefero, this court recognized that Houston-Sconiers was limited to the sentencing of juvenile offenders and overruled Brown only as it applied to those offenders.  14 Wn. App. 2d at 831-32.

Kasparova argues that In re Pers. Restraint of Monschke, 197 Wn.2d 305, 482 P.3d 276, 279 (2021) extended Houston-Sconiers to youthful adult offenders. In Monschke, the Supreme Court held that under article I, section 14 of our state constitution, a sentencing court must exercise discretion when sentencing any 18, 19, or 20 year old to life in prison without parole and it reversed two mandatory life sentences for defendants aged 19 and 20 at the time of their murders.  Id. at 329.

We decline to extend <u>Monschke</u> to this case. First, the discussion in <u>Monschke</u> focused on mandatory sentences of life without parole. Here, life without parole was neither mandated nor imposed. Second, <u>Monschke</u> spoke of defendants under 21 years of age at the time of their crimes. Kasparova was 21 at the time of the murder. The Supreme Court did not address mandatory 20-year minimum sentences for murder under RCW 9.94.540(1)(a), or mandatory 5-year firearm enhancements under RCW 9.94A.533(3)(a) for offenders over the age of 21 at the time of their crimes.

Finally, even if the trial court had the constitutional discretion to depart from the mandatory statutory minimum sentence in this case, it said it would not have shortened Kasparova's sentence.

> [E]ven if it weren't for the cases that seemed to indicate they're limited to juvenile jurisdiction only, the Court has considered this long and hard and is using its discretion not to impose an exceptional sentence down, and would do the same even if the penalties were not mandatory for murder in the first degree.

Resentencing is unnecessary because the trial court clearly indicated if it had the discretion to do so, it would have still imposed the sentence it did.

We affirm.

Andrus, A.C.J.

WE CONCUR:

Mann, C.J.

Appelwick, J.

- 40 -